[Cite as *In re C.A.*, 2016-Ohio-7349.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

IN RE:                                        **CASE NO. 17-16-09**

     C.A.

**ADJUDGED ABUSED, NEGLECTED**
**AND DEPENDENT CHILD.**           **O P I N I O N**

**[TIMOTHY ANDERSON - APPELLANT]**

**Appeal from Shelby County Common Pleas Court**
**Juvenile Division**
**Trial Court No. 2014-DEP-0011**

**Judgment Affirmed**

**Date of Decision:  October 17, 2016**

APPEARANCES:

    *Jim R. Gudgel* **for Appellant**

    *Brandon W. Puckett* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Father-appellant Tim Anderson ("Anderson") brings this appeal from the judgment of the Court of Common Pleas of Shelby County, Juvenile Division, terminating the parental rights of Anderson. Anderson claims that the trial court's decision as to the best interest of the child was against the manifest weight of the evidence. For the reasons set forth below, the judgment is affirmed.

{¶2} C.A. was born to Anderson and Crystal Litton ("Litton") on August 4, 2014. Doc. 1. Upon her release from the hospital, C.A. was placed into the temporary custody of the Shelby County Department of Job and Family Services, Children Services Division ("the Agency"). Doc. 4. The basis for the removal was that C.A. was a dependent child because her six siblings had been removed from the home and no progress was being made on the case plan by Litton and Anderson. Doc. 3. C.A. was later adjudicated dependent and ordered to remain in the custody of the Agency. Doc. 29, 38, 43, and 51.[1] Anderson and Litton then began working on the goals set forth in the case plan and were noted to be making "some progress" at the January 26, 2015, case plan review. Doc. 53. The trial court continued the temporary custody of the Agency after the review hearing. Doc. 55.

{¶3} On July 9, 2015, the Agency filed a motion to suspend Anderson's visitation with C.A. due to his becoming "verbally abusive and threatening" towards

---

[1] The initial adjudication and disposition applied to Litton only. The second adjudication and disposition applied to Anderson after paternity had been established.

the Agency's representatives. Doc. 56. The motion was granted by the trial court temporarily that same day, but extended after a hearing. Doc. 57, 61. A second case plan review was conducted on July 13, 2015. Doc. 58. At that time, it was noted that Anderson was living in a hotel, Litton had been sent to prison, and Anderson had been terminated from counseling for being uncooperative. *Id.* at 3-4. His progress in regards to the case plan was noted to be "insufficient". *Id*. at 4.

{¶4} On October 26, 2015, the Agency filed a motion for permanent custody. Doc. 63. The motion alleged that C.A. had been in the custody of the Agency for more than twelve of the last twenty-two months and that it would be in her best interest to terminate the parental rights and grant permanent custody to the Agency. *Id*. A hearing was scheduled for the motion on February 19, 2016. Doc. 106. Prior to the start of the hearing, Litton indicated that she wished to voluntarily surrender her parental rights. *Id*. The trial court accepted the surrender and found it was in the best interest of C.A. *Id.* The trial court then continued the hearing after learning that Anderson had not been properly provided notice of the hearing. Doc. 107. The hearing was then held on March 10, 2016. Tr. 6.

{¶5} At the hearing, Anderson admitted through his attorney that C.A. had been in the temporary custody of the Agency for twelve out of twenty-two months. Tr. 9. The Agency then began presenting the testimony of five witnesses. The first was Carmen Martin ("Martin"), who had been the home coach for Anderson at the beginning of C.A.'s case. Tr. 12. Martin was responsible for supervising his

visitation with C.A. and providing advice on parenting. Tr. 12. Martin worked with Anderson two times a week during the fall of 2014 before she left the Agency to take another job. Tr. 13,15. According to Martin, Anderson's interaction with C.A. was fine. Tr. 15. During the visits, Martin also worked with Anderson on financial issues. Tr. 15. Martin testified that Anderson did not have stable employment during the time she worked with him. Tr. 16. Martin also testified that Anderson usually had an "uncooperative attitude and just kind of seemed angry a lot." Tr. 17. Although she recalled that Anderson always seemed angry, she did not recall any specific incidents. Tr. 18. Anderson was just generally angry about the case and argumentative when she made suggestions. Tr. 19.

{¶6} On cross-examination, Martin testified that Anderson was argumentative when they were talking about the case. Tr. 21. Anderson was frustrated with the system and the fact that C.A. was taken by the Agency. Tr. 21. There were no concerns about Anderson being angry with C.A. Tr. 22. When there was a visit by developmental intervention specialists, Anderson would roll his eyes and curse at them. Tr. 24, 28. Martin testified that she felt that there was a great deal of tension, so she tried to keep the situation from escalating. Tr. 26. Martin agreed that Anderson was angry about how he perceived he was being treated by the Agency. Tr. 31.

{¶7} Amy Swaney ("Swaney") testified that she was the home coach for the Counseling Center for Wellness. Tr. 36. Swaney worked as a home coach for

-4-

Anderson from December 2014 until July 2015, when his visits were suspended. Tr. 37-40. As the coach she worked with Anderson on obtaining housing, obtaining food, and financial concerns. Tr. 39. At no time did Anderson provide Swaney with pay stubs as she requested, but she did see proof of taxes filed, which indicated income. Tr. 40. Swaney testified that Anderson had no steady income during the time she worked with him. Tr. 40. Anderson told her he was employed, but she never saw any proof. Tr. 41. Swaney also worked with Anderson on controlling his anger. Tr. 42. According to Swaney, Anderson was angry at the visits because he believed "everyone was against [him]." Tr. 43.

{¶8} When Swaney first started working with Anderson, the visits were going well and were moved to his residence. Tr. 44. When she started pushing the financial situation, she would arrive for the visits with C.A. in her arms only to find Anderson was not there. Tr. 44. The visits were then moved back to the Agency's office. Tr. 44. The visits were returned to the office on February 24, 2015, and then Anderson's progress "started to go downhill". Tr. 44-45. Anderson would start to leave visits early, would miss some visits, and spent at least one visit with his back to C.A. and Litton, instead spending the entire time complaining about how "everybody was out to get him and it was a conspiracy." Tr. 45-46. By April, Anderson was spending only twenty to thirty minutes of a two-hour visit interacting with C.A. and the remainder of the time talking about the alleged conspiracy. Tr. 47. When asked whether she thought Anderson was able to parent C.A. at that time,

Swaney said no because she thought Anderson had "a lot of anger built up" that would affect C.A. Tr. 53.

{¶9} On cross-examination, Swaney admitted that during the visit where Anderson sat with his back to Litton and C.A., C.A. had come to the visit with hives on her back and stomach. Tr. 54. Anderson was upset and wanted C.A. to be taken to the doctor. Tr. 55. Swaney did not feel that it was necessary for C.A. to go to the doctor, so had told Anderson no. Tr. 55-56. Swaney also admitted that Anderson had had previous children removed from his home, so may not have a positive opinion of the Agency. Tr. 56-58. At no time did Anderson make threats directly to Swaney. Tr. 58. At no time did Anderson injure or threaten either Swaney or C.A. Tr. 59.

{¶10} Upon cross-examination by the Court Appointed Special Advocate ("CASA"), Swaney testified that at the end of a primary care team meeting, Anderson had aimed an expletive comment at her. Tr. 60. Swaney testified that she did feel a "little bit" threatened by his statement. Tr. 61.

{¶11} Dale Agnew ("Agnew") testified that he was a therapist at the Counseling Center for Wellness. Tr. 64. Agnew testified that he had worked with Anderson for approximately four years, but had not done so in six to seven months. Tr. 65-66. Counseling was terminated after Anderson made some vague threats about no one at the office being safe. Tr. 66. The statement was made after

Anderson's visitation with C.A. was cancelled for failing to confirm it and Anderson was angrily storming out of the office. Tr. 67.

{¶12} Agnew testified that Anderson was referred to him for cognitive behavioral/solution focused therapy. Tr. 75. Anderson came to him for substance abuse issues, antisocial personality issues, and depressive issues. Tr. 76. These issues appeared to stem from problems with primary supports, housing, finances, and employment. Tr. 76. Anderson's attendance at therapy varied from consistent at times to sporadic at times. Tr. 76. According to Agnew, Anderson would make progress, then he would regress when things did not go his way. Tr. 77. The last session with Anderson was on March 26, 2015, and Anderson ended the therapy claiming that it did not matter because no matter what Anderson did, it would not be enough for the Agency. Tr. 78. Agnew testified that Anderson would get close to having his children returned, but at the first set back, he would give up. Tr. 79. Agnew had discussed Anderson seeing a psychiatrist to be prescribed antidepressants. Tr. 80. When Anderson was participating in therapy, he was "relatively stable." Tr. 80. After Anderson terminated services with Agnew, he went to Shelby County Counseling, but Agnew was unaware of whether Anderson was still receiving services through that agency. Tr. 82.

{¶13} On cross-examination, Agnew testified that Anderson's anger was directed towards the Agency and Anderson did not take his anger out on Agnew. Tr. 83-84. Agnew testified that Anderson's frustration and anger was reasonable

considering the circumstances. Tr. 85-86. All of the urine screens Anderson completed for Agnew tested negative for drug usage. Tr. 86. When Anderson made his vague threat, he was angry about not getting to see C.A. Tr. 87. Anderson on many occasions stated that he loved his children and wanted to have his children back in his home. Tr. 88.

{¶14} Upon cross-examination by the CASA, Agnew testified that they always call the police anytime a threat is issued regardless of the content or who makes it as a safety precaution. Tr. 89. Agnew described Anderson's focus on a conspiracy against him as "pathological". Tr. 89. Although Agnew had tried to get Anderson to seek medication to help with the depression, Anderson refused because he believed it would be used against him by the Agency. Tr. 91. On re-direct, Agnew testified that Anderson's anger is not only aimed at the Agency, but at any entity he feels has wronged him. Tr. 92-93.

{¶15} Cathy Iwanski ("Iwanski") testified that she is the CASA in this case. Tr. 95. As the CASA, she first met C.A. at the end of August or beginning of September in 2014. Tr. 96. Iwanski testified that she had observed Anderson at three visits with C.A., with the last one being when C.A. was approximately eight months old. Tr. 98. Iwanski does not believe that Anderson can care for C.A. because he lacks steady employment, is not emotionally or mentally mature, and has outbursts of anger. Tr. 99. According to Iwanski, Anderson always seems to be angry. Tr. 100. She testified that she did not feel comfortable going to his home

alone, because of his anger and his attitude. Tr. 101. Iwanski testified that Anderson was not financially able to provide for C.A. as he has not held a regular job. Tr. 102. Additionally, Iwanski testified that in her opinion Anderson could not provide adequate housing, medical care, food, or clothing for C.A. without "handouts". Tr. 102-103. Iwanski also doubted that Anderson had the patience required to handle a two-year old. Tr. 103. At the time of the hearing, Anderson had not been involved with C.A. since his visits were cancelled due to his anger issues. Tr. 105. As to siblings, Iwanski testified that C.A. has not met her birth siblings, but is bonded to her foster sibling. Tr. 105-106. To Iwanski's knowledge, C.A. has not met any member of her paternal biological family except Anderson. Tr. 106.

{¶16} Iwanski testified that the foster family loves C.A. and provides her with a good home. Tr. 106. The foster family is meeting her physical and emotional needs. Tr. 106. Although C.A. has developmental delays, the foster family has been actively addressing those. Tr. 107. C.A. has only lived with the one family and knows her foster parents as her parents. Tr. 108. Iwanski testified that the best placement for C.A. would be adoption by her foster parents. Tr. 108. In her opinion, it would be in C.A.'s best interest to have custody granted to the Agency. Tr. 109.

{¶17} On cross-examination, Iwanski testified that she had felt threatened by Anderson, but admitted that she had not contacted the police, instead just reporting it at the team meetings. Tr. 110-11. Iwanski also admitted that although she believed that C.A. was born with fetal alcohol syndrome, there is no diagnosis

supporting her opinion. Tr. 114. Even if C.A. were to have fetal alcohol syndrome, that would be the result of actions by Litton, not Anderson. Tr. 114. If C.A. were to be returned to Anderson, there are programs that would assist him in obtaining and maintaining housing and food and in meeting her medical needs. Tr. 115-116. Iwanski admitted that she could understand why Anderson would not like her since she had previously recommended that his parental rights of his three other children should have been terminated. Tr. 119.

{¶18} The final witness for the Agency was Barbara Reindel ("Reindel") who was the caseworker. Tr. 139-40. Reindel testified that C.A. was found to be a dependent child "based on the issues within the family that dealt with substance use and abuse, domestic violence, relationship issues, inappropriate care and discipline of the children and unstable housing and schooling for those children." Tr. 141. C.A. was placed with the foster family soon after she was born. Tr. 141. At no time was C.A. returned to the custody of Anderson or Litton. Tr. 141. The case plan called for Anderson to establish and maintain a home, which he has not done. Tr. 142. Reindel testified that to her knowledge, Anderson had been homeless since July of 2015. Tr. 143. Anderson had failed to consistently obtain and maintain employment, with most of his jobs lasting only from a couple days to a couple of weeks. Tr. 143. During the case plan, Anderson was uncooperative by failing to provide the requested information and having limited involvement with C.A. Tr. 143-44. Since July 6, 2015, Anderson has had no contact with C.A. due to the visits

being suspended. Tr. 144. According to Reindel, Anderson did have good attendance with seeing Agnew as he made 17 out of 21 scheduled appointments. Tr. 144. However, the counseling was terminated because Anderson decided to stop attending in March of 2015. Tr. 145. Although Agnew had recommended psychiatric attention, Anderson had refused. Tr. 145. Reindel testified that she referred him to Shelby County Counseling for crisis intervention when she saw he was at an emotional crisis point in 2015. Tr. 145. Anderson went for the assessment on August 12, 2015, and one follow-up appointment on September 29, 2015, but then failed to attend. Tr. 145. Reindel also testified that there were not many drug tests performed because she could not locate Anderson many times and that he had refused drug screens a couple of times, with the last time being February 24, 2016. Tr. 146. Reindel testified that on October 13, 2015 and November 10, 2015, Anderson was arrested and charged with drug related activities. Tr. 146. Additionally, Anderson was awaiting sentencing on a theft conviction. Tr. 146. As of February 24, 2016, Anderson was refusing to sign releases. Tr. 146.

{¶19} Reindel testified that Anderson felt persecuted and expressed that feeling through "threatening and intimidating actions and words." Tr. 147. She also described Anderson as dishonest with the Agency and himself. Tr. 147. She indicated that the team meetings were non-productive due to "the attitude and the behaviors and the mindset presented by" Anderson. Tr. 147. Reindel testified that Anderson had not successfully completed one thing in the entire case plan in the

year and a half it was in effect. Tr. 147. Rather than improving over time, Anderson's emotional condition had worsened. Tr. 148. At the February 24, 2016, meeting, Anderson refused every request. Tr. 148. When she asked him where he wanted his mail to go, he told her to keep it and threw it in the trash as he left. Tr. 149. Prior to that meeting, Anderson had not come to the Agency since September of 2015. Tr. 151.

{¶20} Reindel testified that C.A.'s current caregivers are excellent and are meeting all of her needs. Tr. 152. The foster parents have been working on C.A.'s developmental issues since they were identified. Tr. 153. They are interested in adopting C.A. if she were to become available for adoption. Tr. 153. Reindel recommended that C.A. be allowed to remain with her foster parents. Tr. 153. Reindel also indicated that family placement was not an option in this case for a variety of reasons. Tr. 154. Reindel testified that it was in C.A.'s best interest to be placed in the agency's permanent custody. Tr. 155.

{¶21} On cross-examination Reindel testified that C.A. was born healthy, but had been exposed to alcohol prior to birth due to Litton's drinking. Tr. 157. C.A. was only ruled dependent due to what had occurred with the other children. Tr. 158. Reindel testified that she did not believe additional time would benefit Anderson because despite the agency offering numerous referrals, Anderson had "chosen not to participate, not to cooperate, not to make changes." Tr. 161.

**{¶22}** After the Agency finished presenting its case, Anderson testified on his own behalf. Anderson testified that he felt like the Agency had already determined to remove C.A. from his custody before she was even born. Tr. 167. Anderson testified that C.A. was born with no toxins in her system, but the Agency took her anyway. Tr. 169. When C.A. was born, Anderson and Litton were living in a two-bedroom apartment and he was working. Tr. 170. Between Anderson and Litton, they had a monthly income between $2,500 and $3,000. Tr. 170. Anderson believed that the Agency was not assisting him with trying to reunite him with C.A. Tr. 172. At the beginning he tried to do everything the Agency asked. Tr. 174. However, he was told "in a roundabout way" that the decision had already been made to terminate his parental rights to C.A. Tr. 174. Based upon his experiences, Anderson felt that he was mistreated by the Agency and not given a chance to show he could parent C.A. Tr. 175. Anderson had not been able to see C.A. in eight months after the Agency terminated his visits. Tr. 176.

**{¶23}** Anderson testified that the alleged threat that was placed on his mother's answering machine, was not made against anyone else, but was a threat of suicide. Tr. 177. However, at the hearing, Anderson indicated that he no longer felt suicidal, but was focused on trying to "get [himself] back together, on [his] feet." Tr. 177. Anderson indicated that if C.A. were to be returned to him, he would do anything he could to provide for her and to keep her safe. Tr. 177-78. Anderson

indicated that he quit working with the Agency because they had indicated he had no chance to get C.A. returned to him. Tr. 179.

{¶24} On cross-examination by CASA, Anderson admitted that he last attended a team meeting in either April or July of 2015. Tr. 181. Anderson also admitted that he was living in a temporary residence at that time as he was unemployed. Tr. 183. Anderson became frustrated during the developmental testing because he "felt that it was being overdone." Tr. 186.

{¶25} When questioned by the Agency, Anderson admitted that he did not follow through on Agnew's recommendation for medication. Tr. 190-91. Anderson also admitted that for the three to four months before the hearing, he had been staying at two different addresses with friends. Tr. 191-92. However, he indicated that if he had C.A., he would get his own place. Tr. 193. At a later point in his testimony, Anderson stated that he had lived in his car since April of 2015. Tr. 196.

{¶26} On April 8, 2016, the trial court entered judgment terminating the parental rights of Anderson and granting permanent custody of C.A. to the Agency. Doc. 120. Anderson filed a timely notice of appeal from that judgment. Doc. 121. Anderson raises the following assignments of error on appeal.

**First Assignment of Error**

**The [trial court's] decision, when it found that it was in the best interest of the minor child to terminate [Anderson's] parental rights, was against the manifest weight of the evidence.**

## Second Assignment of Error

**The [trial court] did not consider all of the statutory best interest requirements in arriving at its decision.**

We will address the assignments of error out of order for the purpose of clarity.

*Best Interest of the Child*

{¶27} The right to parent one's own child is a basic and essential civil right. *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." In re Leveck, 3d Dist. Nos. 5–02–52, 5–02–53, 5–02–54, 2003–Ohio– 1269, ¶ 6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. *Id.* When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include, in pertinent part, as follows.

> **(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **\* \* \***
>
> **(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period \* \* \*.**

**For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to [R.C. 2151.28] or the date that is sixty days after the removal of the child from home.**

**\* \* \***

**(C) In making the determination required by this section \* \* \*, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child. A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section \* \* \* but shall not be submitted under oath.**

R.C. 2151.414.

{¶28} The determination whether to grant a motion for permanent custody requires a two-step approach. *In re G.B.*, 10th Dist. Franklin No. 04AP–1024, 2005–Ohio–3141, ¶ 13. The first step is to determine whether any of the factors set forth in R.C. 2151.414(B)(1) apply. *Id*. If one of those circumstances applies, then the trial court must consider whether granting the motion is in the best interest of the child by considering the factors set forth in R.C. 2151.414(D). *Id*.

{¶29} A review of the record in this case indicates that C.A. was removed from Anderson's custody on August 6, 2014. Sixty days from that date would be October 5, 2014. C.A. was adjudicated to be dependent, as it pertains to Anderson, on December 29, 2014. Thus, pursuant to statute, the date to be used for the purpose of determining a twelve-month period out of a consecutive twenty-two-month

period would be October 5, 2014, as it is the earlier date. The motion for permanent custody was filed on October 26, 2015. This is over a year later. The fact that C.A. had been in the temporary custody of the Agency for more than twelve-months in a twenty-two-month period was admitted by Anderson at trial. Thus, the portion of the judgment entry finding that C.A. was subject to the provisions of R.C. 2151.414(B)(1)(d) is supported by the record.

{¶30} This then takes us to the second part of the analysis: the best interests of the children factors set forth in R.C. 2151.414(D). These factors are 1) the interaction and interrelationship of the child with parents, siblings, relatives, foster parents, and anyone else who significantly affects the children; 2) the wishes of the children; 3) the custodial history of the children; 4) the children's needs for permanency; and 5) any factors set forth in R.C. 2151.414(E)(7-11). R.C. 2151.414(D). In this case, the trial court specifically addressed the first four factors and indicated that it had considered all of the factors. Doc. 120 at 4-5. The trial court made specific findings as to the bond, or lack thereof, between Anderson and C.A., the wishes of C.A., as expressed through the CASA for C.A., the custodial history of C.A. and that she had only lived with one family since birth, and C.A.'s need for a legally secure placement along with Anderson's inability to provide that for C.A. A review of the record indicates that although the trial court did not state that one of the factors in R.C. 2151.414(E)(7-11) was met, there was evidence to support such a finding. As regards R.C. 2151.414(E)(11), Anderson admitted that

he had previously had three prior children removed from his custody by the Agency. Tr. 202. The findings of the trial court were supported by competent, credible evidence in the record. The trial court did consider the statutory factors as to the best interest of C.A. and the second assignment of error is overruled.

*Manifest Weight of the Evidence*

{¶31} In the first assignment of error, Anderson claims that the trial court's determination to terminate his parental rights is not supported by the evidence. There is no dispute that the first prong of the test, that C.A. had been in the custody of the Agency for more than twelve months in a twenty-two-month period, had been met. The only issue for review is whether the trial court's findings as to C.A.'s best interest were supported by the record. Upon review of the interrelationships between C.A. and the people in her life, the trial court determined that Anderson and C.A. had no bond. The evidence presented was that starting in March of 2015, Anderson was sporadic in his visits, missing several consecutive visits in April and May. As of July 2015, Anderson's visits were suspended due to his behavior. The testimony also showed that C.A. is very attached to her foster family and that they wished to adopt C.A. This testimony supports the findings of the trial court as to R.C. 2151.414(D)(1)(a).

{¶32} As to the second factor set forth in R.C. 2151.414(D)(1)(b), the trial court indicated that C.A. was too young to express an opinion. Since C.A. was less than 2 years of age at the time of the hearing, this finding is supported by the record.

The CASA for C.A. testified that in her opinion, Anderson could not parent C.A. and stated that the termination of Anderson's parental rights was in the best interest of C.A. Thus, the findings s to this factor are supported by the record.

{¶33} The third factor considers the placement history of the child. The testimony was that C.A. was born on August 4, 2014, and placed with her foster family on August 6, 2014. Since that time, she had not lived with any other family. The trial court's findings as to R.C. 2151.414(D)(1)(c) are supported by the record.

{¶34} The fourth factor specifically addressed by the trial court was C.A.'s need for a legally secure placement. The evidence presented at the hearing showed that Anderson lacked stable housing, either living in his car or staying with friends since April 2015. Before that, he was living in a hotel with Litton. Throughout the case, he worked sporadically and at the time of the hearing, was unemployed again. There were also issues regarding his mental health and his anger. The testimony, even that by Anderson himself, indicated that he did not want to work with the Agency or to do what they asked. The trial court compared that with the evidence that C.A. was in a good situation, that she had bonded with the foster family, and that they wished to adopt her. She had spent her entire life in the custody of the Agency. Anderson had showed that he was not, at the time of the hearing, providing a stable environment for himself. Given all this evidence, the trial court determined that C.A. needed a stable and legally secure environment. This was supported by the record.

{¶35} Although the trial court did not specifically discuss the fifth factor, there was evidence to support a finding pursuant to it as was discussed above. The trial court stated that it had considered that factor as well. The record provides competent and credible evidence in support of the trial court's conclusion that the termination of parental rights would be in C.A.'s best interest. Viewing the evidence, this court finds that the Agency proved that the termination of Anderson's parental rights and the grant of permanent custody of C.A. was supported by clear and convincing evidence. The first assignment of error is overruled.

{¶36} Having found no error prejudicial to the Appellant, the judgment of the Court of Common Pleas of Shelby County, Juvenile Division, is affirmed.

***Judgment Affirmed***

**SHAW, P.J. and ROGERS, J., concur.**

**/hls**